The name is Hilton Tomlinson. I am one of the attorneys representing the 383 plaintiffs here on appeal who were victims of a Ponzi scheme conducted by Mr. Frank Perry back in December of 1999 to July of 2001. As a result, my clients, along with hundreds of others who I do not represent, lost tens of millions of dollars. I quite frankly think the issue today is fairly simple, but then again hard to answer, and that is this. To what extent is this Court willing to stretch the discretionary function exception under the Federal Tort Claims Act? In this situation, the District Court, in analyzing the complaint and the submissions, found that the discretionary function exception applied here when the FBI had knowledge of a continuing criminal conduct that was being committed by their informant while under their custody and control, and this conduct, this Ponzi scheme, had no relationship, none, no relationship for which the informant was being used by them. So you've got this, there is no political, social, economic policy basis to justify their decision to sit there and watch him continually run this criminal conduct, this criminal scheme. Is law enforcement's failure to protect or failure to warn about a tort, is that a tort under Nevada law? Yes, sir. It's not the... I mean, does a local police officer commit a tort if he doesn't, if he knows there's going to be a robbery and he negligently doesn't fend it off? No, sir. It's not a tort? That's not a tort. Well, how can this be a tort? This is not different than that. This is a situation where you take, for instance, that if he sees the robbery going on and he turns his back and walks away, fine. But I don't think that you can compare that to this situation because then you're looking at whether a police officer has some duty to do something. That's not the law. You've got to look to see is the United States liable because a private individual would be liable in the same situation. Well, the United States is not liable. The FBI agent is a law enforcement official, of course. The local police officer on the beat is a law enforcement official. If he knows, reasonably should know, as a competent officer, there's going to be a holdup in a gas station and he just goofs off and he doesn't do anything to prevent it and someone gets killed in the gas station, that's not a tort under Nevada law, is it? No, sir. Okay. Now, as a matter of fact, now that I think of it, I think your position, of course I'm not deciding the case, I'm just sounding out here, your position I think might even be not as strong as that because where the police officer doesn't do anything and someone goes and sticks up a gas station, well, the people in the gas station, they're unfortunate victims of a holdup. But your people bought into this through greed or whatever and, in other words, they volunteered to get into this nonsense. So your position isn't even as strong as the person that gets held up in the gas station and says, gee, that police officer goofed off, he should have protected me. Well, your Honor, let me say this. I don't think that I can sit there and try to prove that a police officer is guilty or not guilty under the Federal Tort Claims Act because under U.S. v. Olson, the court says you got to look at the private individual. So under Nevada law, if there is a special relationship, well, let me go back. Under common law, like you said, they would have no duty. But if there is a special relationship between the defendant and a dangerous person or the potential victims, the defendant is impressed with the duty to warn foreseeable victims of the foreseeable harm. He's just an FBI agent. He's sworn to uphold the law, just like the cop on a beat is a law enforcement official, also sworn to uphold the law. The special relationship is the FBI and the informant. He's the dangerous person. Yeah, but he might have a special relationship with the guy who's the informant or in the special relationship to the person that buys into the Ponzi scheme. It doesn't have to be that. The exception says special relationship to the dangerous person or the victims, either one. What says that? That went over my head. I'm sorry. Is that Nevada law you mean you're talking about? That's common law. Yes, sir. There is a case of Mangerous v. Gordon in Nevada that cites that. Was that in your brief? No, it wasn't, Your Honor. I was going to say I missed it if it was. Mangerous v. Gordon relied upon Tarasoff, right? I'm sorry? Mangerous relied upon Tarasoff, which is the seminal case. Right. That's the California case involving the psychiatrist or psychologist who failed to warn the victim that the patient, the psychologist's patient was going to cause harm or kill the victim. Right. And it also cites the statement second of torts, but both of those are limited to physical harm, and they make a pretty big point of saying you've got to warn as a result if what you are aware of. If there's a special relationship, and I'll give you the special relationship for purposes of this question, and probably there is, but assuming a special relationship, you run into the limitation that the Tarasoff line of cases is limited to bodily injury. Let me point an example out to you. For instance, let's say this. A business person suspects that someone is embezzling in his company, and he hires a private detective to come in there and figure out who's doing this embezzlement. And he says, I'm not hiring you as an employee. I just want you to come in, buddy up with everybody, and discover who's doing the embezzlement. And in the meantime, he buddies up with everyone, and then what does he do? He starts running a Ponzi scheme against these employees. There's your special relationship. Where's the physical harm? There is no physical harm, but there is economic harm. Wasn't that exactly what Judge Kaczynski asked you about? But I'm saying that this is an exception. This is an exception. There is economic harm in a special relationship situation. I don't believe you understood my question. I'm sorry. The case on which you base, this is Mangia's, this is the Nevada case, is based on authorities, all of which limit this doctrine to cases where the party with a special relationship is going to cause physical harm, not economic harm. That's it. It doesn't go beyond that. So you can have a special relationship. I'll grant you the analogy. You can say they're aware of it. There's simply no duty under Nevada law, as I read it, to warn somebody that they're about to get hurt economically. Fair enough just doesn't go any farther than beyond physical harm. I would agree with you on that. But I would also say that in the right circumstances, and today we're in the right circumstances, that if Nevada looked at this situation, they would find that economic harm can be rewarded. And what do you base that on? What you're saying to me, if I can translate your words, is that if this were now before the Nevada Supreme Court, you think the Nevada Supreme Court would say not just physical harm, but also economic harm? Yes, sir. That's what. Okay. What makes you think that? The only thing that would make me think that is my example. And that is, you've got economic harm there, and you've got a special relationship. There's no physical harm. And it's a private situation. No, I mean, it sounds to me like that's exactly the kind of case that the terrorist offline locations would exclude. They're very worried about it. There's a involving people in a, or creating a responsibility for preventing crimes against third parties is a pretty onerous duty. And you could say, well, you know, if what you're talking about is that somebody is actually going to hurt another human being, then we're going to impose that. But that's the limit. We're not going to go beyond that. I mean, Terrorist Office itself, if you recall, when it came out, was quite a breakthrough, quite a departure from the common law. The common law said there's no duty at all. There's never a duty to, you know, there's an intervening cause, there's intervening harm, a third party causes the damage, and you are not, you know, don't have any responsibility for stopping it. And Terrorist Office departed, and that's now a well-accepted law, I think, in most places, including Nevada. But I think they drew a pretty firm line with physical harm, and I just don't see any indication that any court anywhere has gone beyond it. You have to break totally new ground. Well, that's what I'm here for, I guess, because that's the, if I thought that my fact situation was presented to a trial court or a Supreme Court of Nevada, I would dare say that they would fine. Are you seeking a referral to the Nevada Supreme Court? If that's what it takes, yes, sir. You know, just telling me I want to win doesn't tell me, you know, so you want to win no matter how, right? If I said to you, gee, if you flip a coin, if you flip a coin, would you, and you say, well, if that's, I'm asking you. Are you suggesting that we should do that? I don't know. I think it's a question of first impression, certainly. If you had to plead over, do you think you could cure, well, let's say you don't prevail here. Of course, we haven't conferenced yet. Assume the worst. Is there an amended complaint that you could fashion that would hold water? Well, if I'm going to have to. Did anybody have a heart attack as a result of the Ponzi scheme? Emotional distress. I mean, God forbid. I'm just saying emotional distress. I'm not even sure. I'm just speaking out loud here. I'm not sure that this is a case where we can refer them out of the state Supreme Court because, of course, we're not in diversity. We are here under the Federal Tort Claims Act and sending the United States to a state court is sort of the reverse of what usually happens. Anyway, you are out of time. Let me hear from the opposing counsel. Thank you. Good morning, Judge Kuczynski, gentlemen. My name is Ray Ruckstell. I just have a few things that I would like to say in response to counsel's argument. First of all, there is no authority in the United States of America from Portland, Maine, to Portland, Oregon, that supports the plaintiff's position. That is, under these circumstances, that the FBI conduct in this situation, in this case, is not subject to the discretionary function of the Federal Tort Claims Act. Well, I don't know about that. Counsel can't say that. Don't the guidelines, don't the FBI guidelines require lower-level FBI employees before they use an informant to do a suitability review and to report any illegal activity to the superiors? I don't understand the question, Judge. Pardon? Do you understand the term guidelines? Guidelines, FBI guidelines, the manual, the FBI manual? There's a manual, and the manual is followed. The only violations of the manual — You want to look, you want to come with me? You got your excerpts of record? Excerpts of record. This big book. Yes. You got it? I'm aware of it. I don't have it here with me, Judge, but — You didn't bring it to court with you. No, I — Why did you not bring it to court with you? Because I don't — I'm aware of the manual. Is your boss aware that you come to court unprepared? I'm prepared. I am not unprepared. Who is your boss? The allegations — Is this Mr. Bogdan? Would you, when you go back to your office, tell Mr. Bogdan that you walked into court without your excerpts of record? And I would like Mr. Bogdan to send me a note telling me if that is standard practice for attorneys in the U.S. Attorney's Office in the District of Nevada. Do you understand? Your Honor, I have — Do you understand? I do understand. Okay. I do have the excerpts of record. Will you see if you can — you have them with you? Yes. Well, take them. Pull them out. I think the answer is no. It's not thick enough. It's a big, wide book like this. I have the Federal Defendant's supplemental excerpts of record. Well, that's not what I'm referring to. I'm referring to your — to excerpts of record volume one. Yes. I do not have that volume with me, Your Honor. Okay. You will talk to Mr. Bogdan, and you will ask Mr. Bogdan to send me a letter explaining to me whether there's standard practice for lawyers at work for him to come to court without their excerpts of record. You will ask him to do that for me? If that's the court's instruction, certainly. You think I'm telling you this because I'm just kidding? Do you understand what I'm asking of you? I do, sir. Okay. Now, see if opposing counsel has an excerpt of record that he is willing to — Are you the boss in your office? No. Well, you better write me a note explaining to me whether that's your standard practice. Or is this what they do in Nevada? I'm sorry? Is this what happens in Nevada? I think he's in Alabama. No, I'm from Birmingham. Well, you write me a note, too, telling me whether your standard practice is to come to court without your excerpts of record. Now, you got it in front of you? Turn to page 142. Is that one? Okay. The numbers are at the bottom. I have 142 in front of me. Okay. Paragraph 15, line 23. This is a reference to an attorney general's guidelines on confidential informants. Do you see it? Yes, I see it, sir. Okay. Look at the next page. These guidelines provide that when an informant engages in unauthorized illegal activity, it is to be promptly reported to FBI headquarters and the appropriate prosecutor in the jurisdiction. That's correct. Okay. The guidelines provide this, yes? Is that one? Is this an accurate statement of what the guidelines provide? That is an accurate statement as far as the guidelines require, yes. Okay. And that was done. So this was reported to FBI headquarters? Of course. The moment they found out, on May 26th, 2001, I may have the ‑‑ let me give you the precise date, Judge Krasinski. Okay. And where are the records? May 22nd, 2001. I'm sorry? On May 22nd of 2001, the State Attorney General's Office briefed the FBI as to the undercover, as to what Mr. Perry was engaged in, as to their investigation. That same day, the Bureau advised the headquarters and advised the United States Attorney's Office. Yes, that was done. And they were not aware of it before that? They were not aware before that. That's correct. Until the State authorities let them know. That's correct, precisely. So as soon as they found out about it, they reported it? As soon as they found out, they went right to the Assistant U.S. Attorney, Mr. Koh, and they reported it to the appropriate chain up to the headquarters. What happened to it after that? What happened is that the Attorney General, the State of Nevada Attorney General's Office, requested that the Bureau do nothing about this for a couple of weeks so that they can present their case to a State grand jury and indict Mr. Perry. And that happened. And let me correct myself for one date, Judge Kuczynski. On June 25th of 2001 is when the Nevada Attorney General briefed the FBI. June 25th. They asked for a two- or three-week delay so they could present the case to a State grand jury. They did that. On July 17th, Mr. Perry was arrested, and his services and his relationship with the Bureau came to an end. So as far as the ---- They didn't do anything for three weeks. So as far as the record is concerned, we're talking about a three-week delay from the time they found out ---- That's correct. To the time this was put to stop to. That's correct. And the way you justify that three-week delay is what, in the discretionary function? That's correct. There was an undercover operation. State authorities asked the Bureau not to do anything, to keep it secret. Keeping an investigation secret is part of the discretionary function. It rests with Bureau discretion. That's exactly what the FBI did. And then three weeks later, he was indicted. He was indicted on July 17th. And they had no knowledge of this before the briefing by the Attorney General? This is what triggered it. On May 22nd ---- That's the date I gave you earlier, Judge Kondoski. On May 22nd, the FBI agent who was working this operation, it was brought to his attention that State authorities, Las Vegas Metropolitan Police Department, were making inquiries about Perry. What date? And a record check of Perry. I'm sorry. What date did this briefing take place? I'm sorry? What was the date of the briefing again? May 20th. The date of the meeting? The briefing by the Attorney General. June 25th. Of what? 2001. Now, if you look at paragraph 15, go back to page 142. Yes. Look at line 17. I see it. They alleged that it happened in early 2001 that the FBI finally discovered that Franklin Perry was operating a fraudulent Ponzi scheme. Sorry. What line are you on? You're on page 142 line what, sir? 17. All right. In early 2001. Well, I'd say that that's a stretch of using the term early. We're here on Rule 12, aren't we? Yeah. Pardon me? We're here on Rule 12, aren't we? We are. That means we take the allegations of the complaint as true. You have to admit that they're true in order to make the motion. I'm right about that, aren't I? You know, I think for purposes of the briefing. I'm right about that, aren't I? Excuse me, sir? I'm right that the case law for the last half century surrounding Rule 12 is that when you move to dismiss, you admit that the allegations of the complaint are true for the purpose of the motion. That's correct. Okay. So the record before us is that the government learned in early 2001. That's correct. And I provided. Not May. You wouldn't define May as early, would you? Or June. Or June. I suppose it's not late. It's certainly not late, so I guess it's early. Okay. What do we make of that? Well, you know, I think counsel plaintiff makes allegations. And that's how things are done in our courts. That's how things are done. And sometimes they're accurate and sometimes they're not. Well, if they're not, you move for summary judgment. Well, this motion was brought under in the alternative is a Rule 56 motion. It was 12B or 56, Your Honor. Oh, you sought both reliefs. But the district court chose to dismiss on Rule 12. I think on 12B-1. Okay. On lack of subject matter jurisdiction. Well, if you brought a 56 alternative motion, did you have evidence on this point? You just represented to me that the agents did not know about the ‑‑ I heard. You not only hear the question if you interrupt. All right. Maybe ask Mr. Bogdan to write me, too, whether it's custom in his district to have lawyers not listen to the question. Yes, sir. You represented to me that they didn't know, that the agents didn't know until the attorney general briefed them. Yes or no? That's correct. Okay. Is there evidence on that that would have supported a Rule 56 motion or summary judgment on that point? Is there evidence in the record that they say we knew nothing before we learned about it from the state authorities? That was not presented to the district court. So you're making it up? No, I'm not making it up, Judge. You represented. You told me these are the facts. You could have said there's nothing on the record on this point, but you stood there and you said this is what is the case. But I assume this is when I asked you a question, I'm not asking your personal opinion about things or what you know outside the record. I'm obviously asking you facts as reflected in the record. Is there anything in the record that supports your position that they didn't know anything about this, that the case agents didn't know anything about this until they were briefed by the attorney general? No. Judge Kaczynski, you asked me a question and I responded to it. That response included specific dates. Those dates are not part of the record below. So my response went outside the record. You don't understand that when you ask questions at oral argument in a case on appeal, your answer must be limited to things in the record? This is news to you? My answer is no. I'm asking you a question. You don't understand that when you're asked a question on appeal, you are to limit your answers to questions, to matters that are reflected in the record? I'm surprised, I'm astonished, I'm flabbergasted that somebody appearing in our courts, and you look like you have some experience as a lawyer, would not understand that basic principle of appellate practice. I understand that basic principle. So nevertheless, you answered to me, you gave me answers to questions based on matters not in the record? I wanted to respond to your question, Judge Kuznicki. The response to a question when there is nothing in the record is to say that matter is not in the record. That's the correct and proper answer. Or you might say, in order to answer that question, I might have to go outside the record. May I do so? It is never okay to stand there and represent things that are not in the record, factual matters that are not in the record. It is an astonishing breach of propriety on the part of a lawyer appearing before us to do something like that. I hope you will have a chat with Mr. Broughton about this, and get him a tape of this argument, and make sure that he listens to it, and understands, and perhaps conveys to lawyers in his office that that is never, ever to be done. Allow me to explain, Your Honor, as to why this is not something that did not cross my mind as I stood here in front of you. This is why I answered the way I did.  Counsel alluded or suggested to the court that the FBI knowledge of this Ponzi scheme was longstanding. At least that's the impression I had, Judge Kaczynski, that counsel made that suggestion, that the FBI was longstanding. It is reflected in his complaint. So he is allowed to do that. He is allowed to tell us things he has alleged in his complaint. You are not allowed to say, gee, that's wrong, because I know it to be wrong. No, I don't take issue with what counsel alleges. His complaint says the FBI found out in early 2001 this operation had been ongoing for a long period of time. The suggestion was that the Bureau knew for a long period of time. You don't have anything in the record to contradict that. I know you stand up there and you state it as a fact, even though the record has absolutely nothing to support your assertion. It is truly astonishing that you would do something like that. And the reason I did that, Judge, is that statement, then, with your specific question. And I recall your question. I think your question, Judge Kaczynski, was when did the FBI find out? And I tried to answer it. Questions like that, counsel. I was not going to allow this to proceed without telling this Court that it's not part of the record. You better have a very serious talk with Mr. Bogdan. And Mr. Bogdan had better send me a letter, not only about the excerpts of record, which is a poor practice but not improper, but what you have done here is improper. I mean, it amounts to an impropriety. It amounts to misconduct on the part of appellate counsel. Do you understand? I understand what you're saying, Your Honor, but I take exception that you would accuse me of misconduct. I understand. And I think you had better have a long talk with your boss about it. And I would like him to send us a letter making sure he explains to us that this issue, which is clearly quite important and quite basic to appellate practice, has been clarified for the lawyers in his office. Do you understand? The tape, the transcript of this argument, or the audio of this argument will be available online in the next 24 hours. And I would like you and Mr. Bogdan to listen to it together. And I would then like to have a letter from him explaining to me or assuring us that his lawyers will not commit such improprieties in the future. Your time is up. Pardon me? Your time is up, sir. Thank you very much. Mr. Bogdan has seven days to write to us. He's what? Mr. Bogdan has seven days to write to us. Do I need to cut an order? Mr. Bogdan is no longer the United States attorney. Well, whoever the United States attorney or the acting United States attorney is. Who is the United States attorney? He's just been nominated. No, who is actually? Mr. Myrie. I'm sorry? Mr. Myrie. That gentleman must write to me next week. All right. Thank you. You have a minute for rebuttal. What do you mean in paragraph 15 of the complaint in early 2001? Your Honor. How do we construe that? This is how I construe it, Your Honor. We're suing more than just the FBI. We're suing the Parole Commission also. I think he's asking you for a date, an approximation. What does the complaint mean by early? We haven't done any discovery. This is what we think has happened. On what basis did you say in the complaint that it was early 2001? Based on some statements that had been given to us. Witness statements? Yes. But it was not specific other than early? That's correct, because we haven't done any discovery. Do you know anything about this briefing that opposing counsel mentioned? Is there anything in the record about that? About the briefing? Oh, no, I don't know anything about that. I have no clue. It's the first time I've ever heard about it. I'm sorry? This is the first time I've ever heard about it. It's not on the record? No, sir. You don't know anything about it? No, sir. That's what we want to get to and develop that. Okay. Did you have anything further? The only thing I would like to point out is that this duty to warn, Your Honor, it certainly wasn't addressed by the district court. And I think that this court would allow us to address that in the district court and to be able to develop our theory down there that it should proceed. Thank you. Yes, sir. Thank you. This argument will stand submitted.
judges: Kozinski, Hawkins, Cowen